[*In re* H—— T——.]

on inquiry amounts to notice, provided the inquiry becomes a duty, as in the case of purchasers and creditors, where the inquiry, if pursued, would lead to knowledge of the requisite facts:" Parke *v.* Neeley, 9 Norris, 59 ; Mulliken *v.* Graham, 22 Smith, 490 ; McCray *v.* Clark, 1 Norris, 461.

An omission to charge upon a particular point, for which there was no request, cannot be assigned for error : Lilly *v.* Paschal, 2 S. & R., 394 ; Poorman *v.* Smith, Idem, 464, 469 ; Dawson *v.* Robinson, 3 W. N. C., 449 ; Davis *v.* Bigler, 62 Penna. Stat., 242.

If no particular instructions are prayed, the Court is responsible only for the general effect of the charge : Reeves *v.* R.R. Co., 30 Penna. Stat., 454.

### BUCKS COUNTY.

JANUARY TERM, 1882, No. 52.            APRIL 25TH, 1882.

## *In re* H—— T——.*

1. Though the Act of May 19th, 1879, P. L., 66, is very badly framed, it was the intention of the Legislature to provide that this Court should review the proceedings of the inferior Courts in striking attorneys from the rolls, in all cases, and should judge of the sufficiency of the cause.

2. Upon proceedings for disbarment, upon a charge of a criminal offence, the Court is bound to consider the accused innocent after an acquittal by a jury.

3. A temporary flight following an accusation of fornication, and of being accessory to the procurement of an abortion, causing the death of the subject, is not an offence of such a character as ought to be visited with the penalty of disbarment.

4. *Semble,* that fornication is not an offence of that character.

5. Where a lawyer suspected of a very grievous and infamous criminal offence, that of complicity in procuring an abortion, but of which he was afterward upon trial acquitted, requested the district attorney to give him time, that

---

* I think the old practice of withholding the names in such applications a good one, and I hope to see it observed in future. ERLE, C. J., *In re* ——, 98 E. C. L. R., 894.

[*In re* H—— T——.]

he might see the prosecutor and fix it up all right, it was not misbehavior in office for which he could be disbarred under section 73 of the Act of April 14th, 1834, P. L., 354.

6. If it was an attempt to obstruct the due administration of justice it was an indictable offence, and the offender was entitled to a trial in due course of law.

Before SHARSWOOD, C. J.; GORDON, PAXSON, STERRETT, and GREEN, JJ. MERCUR and TRUNKEY, JJ., absent.

Error to the Court of Common Pleas of *Bucks County.*

*In re* the report of the members of the bar of Bucks County, and the order of the Court striking the name of H—— T—— from the roll of attorneys.

At a meeting of the members of the bar of Bucks County, held December 2d, 1879, a report was made to the Court setting forth certain charges against H—— T——, a member of that bar. The Court thereupon directed the report to be filed, and that a certified copy be served by the sheriff upon H—— T——, and that permission be given the respondent to answer within ten days after service. The sheriff returned the order served " by leaving a true and attested copy with an adult member of the family with which he last resided, and informing him of the contents thereof; and I return that the said H—— T—— could not be found in the county."

January 7th, 1880, the Court appointed a commissioner to take testimony, and report the same and his finding of facts, and a committee of the bar to prepare charges and specifications, and to conduct the examination. The committee presented a charge of " criminal and unprofessional conduct unbecoming a citizen and member of the bar," and the following specifications:

" 1. In this that the said H—— T——, being at the time a member of the bar of Bucks County, did at divers times during the year 1879, prior to the 3d day of December of said year, commit fornication with one E—— S——, a single woman, and a bastard child on the body of the said E—— S—— did beget.

" 2. In this, that, on or about the 29th day of November, A.D. 1879, the said E—— S—— died at the residence of her father . . . . in consequence of an abortion committed upon her, the said E—— S——; and that the said H—— T—— did aid, counsel and advise the said E—— S—— to have such abortion performed, with intent to produce the miscarriage of the child with which the said E—— S—— was pregnant, and of which the said H—— T—— was the father.

"3. In this, that the said H—— T—— has become a fugitive from justice, having on the 29th day of November, A.D.

[*In re* H—— T——.]

1879, abandoned his usual place of abode and escaped from the jurisdiction of Bucks County,—a warrant for his arrest, charging the said H—— T—— with being an accessory before the facts in the commission of the said abortion, having issued on the 1st day of December, A.D. 1879.

"4. In this, that the said H—— T——, immediately before or immediately after the death of the said E—— S——, endeavored to compound his aforesaid criminal offence by offering the parents of the said E—— S—— the sum of $125 to keep the matter quiet."

The sheriff returned that he "served the within charge, specifications, and notice on H—— T——, Esq., by leaving a true and attested copy with an adult member of the family with whom he had resided in said county, and informing him of the contents thereof."

The commissioner, C. E. Wright, reported the facts to be, "That Mr. T—— was in the habit of visiting Miss S—— since the spring of 1879 ; that he went to her frequently; . . . . . that he came at night, and was left alone with her until two o'clock in the morning ; . . . . . that she was delivered of a male child some four or five months' old ; . . . . . a man in Philadelphia had performed the operation. . . . . . The doctor states that the girl knew she was in a critical position several days before her death, and told him T—— was the father of her child. She said the same during her sickness and before to her mother, that T—— was the father of her child. Miss S—— also told her mother while sick that T—— had given her $25 because he did not want it to come out ; that he would sooner run away and never come back. . . . . . Mrs. S—— had an interview with T——. She told him her daughter was dead. . . . . . She asked him why he had given her that money, saying but for that she would have been here yet. He said she ought to have gone to Ohio. He said further, that he had given her the $25, and she was to pay it back in sewing.

"Mr. Shellenberger, at the time district attorney, met T—— the day of the coroner's inquest. He stated to him that he had had connection with the girl, and wanted him, Shellenberger, to protect him. He wished the matter delayed long enough for him to send a messenger to the S——'s not to give him away. Mr. Shellenberger says he loaned T—— $25 about two weeks before that time. He told Shellenberger that he gave that $25 to Miss S——, and, as witness recollected, stated that he gave it to her for that purpose, but of this the witness was not certain. Mr. Shellenberger says T—— told him afterward, that the $25 had got him out of a tight place. . . A warrant, charging T—— with being an accessory before

[*In re* H—— T——.]

the fact, in procuring the abortion, was placed in the hands of constable John K. Tomlinson, December 1st, 1879. He had never been able to find him. T—— had left Doylestown a few days before he got the warrant. Never has heard of his return, and has no information of his whereabouts. His personal effects were sold after he left, and his office premises passed into other hands."

The commissioner found that specifications 1, 2, and 3, were sustained by the evidence, and that specification 4 was not sustained, and he recommended that the name of H—— T—— be stricken from the roll of attorneys.

August 11th, 1880, the Court adjudged " that the within named H—— T—— be stricken from the roll of attorneys of the several courts of this county, and prohibited from hereafter practicing as such therein."

November 9th, 1880, H—— T—— presented a petition to the Court, setting forth that " the alleged offences contained in the report of the bar were made the subject of inquiry by the grand jury of this county, at February Term, A.D. 1880, and said grand jury found bills embracing all matters and offences alleged in said report, and that thereafter this petitioner voluntarily came and demanded trial, and was arraigned and tried for said offences, at the September Court, A.D. 1880, to wit, on the 16th day of September, when he was declared innocent of all those offences alleged, by the verdict of the jury, duly impanelled," and asking that the decree be vacated.

November 13th, 1880, the Court granted a rule to show cause why the decree dismissing the petitioner from the bar should not be rescinded, making the committee formerly appointed respondents, and directing the commissioner to take testimony and report. A writ of error, taken out by H—— T——, to the Supreme Court was there quashed.

A request made by him for the dismissal of the rule to show cause, so that his petition could be withdrawn, was refused.

Before the commissioner a new specification was presented: " Specification 5. In this, that the said H—— T——, being at the time a member of the bar of Bucks County, after the death of E—— S——, in consequence of an abortion, which said abortion the said T—— was apprised the said S—— was about to have committed, and when a judicial investigation as to the cause and manner of the death was about to take place, under the supervision of the district attorney of the county, J. Monroe Shellenberger, Esq., the said T—— approached the said district attorney, upon the day of the hearing before the deputy coroner of the county, and stated to him, the said district attorney, that he, the said

[*In re* H—— T—— ]

T—— had had connection with that girl out there (meaning the said E—— S——), and wanted him, the said district attorney, to protect him, the said T——, and further endeavored to induce the district attorney to delay judicial investigation, to enable him, the said T——, to send a messenger to the parents of the deceased girl, in order that he, the said T——, might post them, the said parents, in their testimony, so that they, the said parents, would not, in the language of the said T——, 'give him, the said T——, away.' To which request the said district attorney replied, that he could not do anything of the kind; that he was there ready to start for the residence of the said S—— as soon as the deputy coroner was ready. That this interview between the district attorney and the said T—— occurred between four and five o'clock in the afternoon of the 29th day of November, 1879; that the same night the said T—— disappeared, and remained without the jurisdiction of the Courts of Bucks County until about the month of August, 1880; that a warrant for the arrest of the said T—— on the charge of aiding and abetting in procuring an abortion, issued on the first day of December, 1879.

"And it is charged that, upon the occasion of the interview with the district attorney, above mentioned, he, the said T——, endeavored to improperly influence the said sworn officer of the Commonwealth in the discharge of his official duty, and also to give an opportunity to practice upon witnesses about to be examined at the coroner's investigation, to gain some unlawful advantage for himself, and to impede the due administration of justice."

The report and findings of the commissioner sufficiently appear in the opinion of the Court below, WATSON, P. J., discussing the rule to show cause:

"The proceedings in this case originated in a communication made to the Court on the 3d of December, 1879, by a meeting of the members of the bar, averring, among other things, acts affecting the professional and moral standing of Mr. T——. The Court directed that the communication should be filed, that a copy of such parts of it as related to Mr. T——, should be served upon him by the sheriff, and that he be permitted to file an answer thereto. On the 7th day of January, following, the sheriff returned that Mr. T—— could not be found in the county, and that he had made the service by leaving a copy with an adult member of the family where he last resided, and informing him of its contents. No answer was filed by Mr. T——. The matters averred in the communication were, in the opinion of the Court, such as required investigation. They constituted

criminal acts, and unprofessional conduct, such as, if true, rendered Mr. T—— unworthy of membership in an honorable profession requiring the highest character for morality and integrity.

" One of the oldest and most experienced members of the bar was appointed commissioner to take testimony, and to report the same, and his findings of facts in relation to the matters alleged, to the Court, and. a committee of young members was also appointed to prepare charges and specifications of the matters generally averred, and conduct the examination on behalf of the bar. The commissioner was directed to give notice of the time and place of the meeting, and to issue subpœnas for witnesses, to the parties.

" This course was adopted in accordance with the practice of the Court in previous like cases; it was similar to the proceedings in Dickens's Case, 17 P. F. S., 169. It was also analogous to the practice of the Court of King's Bench, where it is frequent to refer motions imputing misconduct of an attorney to a master, who reports to the Court; 3 Ch. Gen. R., 38.

" The committee submitted to the commissioner a general charge of criminal and unprofessional conduct, and four specifications thereof, substantially as follows:

" 1. Fornication with one E—— S——, and begetting upon her a bastard child.

" 2. Aiding, counselling, and advising her to have an abortion produced upon her, which was done, and in consequence of which she died.

" 3. Becoming a fugitive from justice.

" 4. Endeavoring to compound his criminal offence, by offering money to the parents of Miss S——, to keep the matter quiet.

" Notice of the order made by the Court, and of the time and place of the commissioner's meeting, and of the charge and specifications, was served on Mr. T—— by the sheriff in the manner of the service of the first order, he not being found in the county.

" On the 7th of March, 1880, the commissioner presented his report and findings of facts, with the testimony taken before him, and the committee also reported the performance of their duties in the premises. The commissioner's report embraces a clear and concise history of the case and concludes with finding that the first, second and third specifications are sustained by the evidence, and that the fourth is not sustained.

" The report was held under advisement until the June adjourned court, at which time it was, without further spe-

[*In re* H—— T——.]

cial order, again laid over at the adjourned court. In the following August it was taken into consideration, and an order made dismissing Mr. T—— from the bar.

"It is a part of the history of the proceedings known to the Court and to the members of the bar who were present, that at the time when this order was about to be pronounced, Mr. Lear and Mr. Yerkes stated to the Court that they were informed Mr. T—— intended to return and stand his trial, on the indictments which had been found against him by the grand jury, and that they had been retained, or had been told they would be retained by a friend of his to defend him. They also said they were not counsel for him in the matter then under consideration. They suggested that the order about to be pronounced should be withheld until after his trial in the criminal cases, as he might be prejudiced therein by being disbarred. It was, however, after some discussion and consideration concluded both by them and by the Court that there was no danger of being thus prejudiced before the jury who would try him, and the order of the Court was made as intended.

"At that time Mr. T—— was absent from the county. A warrant for his arrest had been placed in the hands of a constable on the 1st of December, 1879; he had left Doylestown a few days before. The constable had not been able to find him. Three indictments had been found by the grand jury, and were then pending against him. His whereabouts was unknown. His communications to the gentlemen about to be employed as counsel to defend him, were made, not directly, but through a friend. There was abundant testimony before the commissioner to warrant and require his finding that Mr. T—— was a fugitive from justice. In this connection it may be remarked that there is nothing developed in the subsequent history of the case to rebut the correctness of the finding.

"Mr. T—— said himself in his testimony before the commissioner on the hearing, that he left Doylestown on Saturday, the day the inquest on the body of Miss S—— was held, the 29th of November, 1879, and was not here again until August, 1880; that he did not lock his office, but left it as he usually did, went to Sellersville and next day to Philadelphia; knew before leaving of the coroner's investigation; had had a conversation with Mr. Shellenberger, district attorney, about it; heard the result before he was out of bed, from a report in the morning papers, that he afterwards went to Kansas City, in Missouri; reached there in the latter part of January; was there two months, but not continually; was in a good many places, stopped off.

[*In re* H—— T——.]

This is the testimony of Mr. T—— himself, to show he was a fugitive from justice.

"A short time after the making of the order of disbarment, Mr. T—— returned to the county, went before the justice who had issued the warrant for his arrest, and entered into recognizance to appear at the next sessions to answer the criminal charges. At the next September sessions he was tried on the indictment that had been found in his absence and was acquitted.

"At the adjourned court, on the 9th of November following, he presented a petition, asking that the order disbarring him should, for the reasons in the petition assigned, be immediately vacated by the Court. The Court declined to do this without further investigation or consideration, and held the petition under advisement until the 13th of the same month, when a rule was entered to show cause why the order should not be rescinded, in which rule the former committee of the bar were made respondents, and their powers and duties under their former appointment were renewed and continued.

"The old commissioner was reappointed to take testimony in support of and in opposition to the rule, and to report the same with his conclusions and findings of facts, and also his opinion as to the propriety of granting the prayer of the petitioner. The intention of the Court was to reopen the whole case, and to give the respective parties full opportunity to sustain or deny the matters originally averred against Mr. T——.

"At this point the proceedings were arrested by a writ of error from the Supreme Court, where the writ was afterwards quashed as having been prematurely sent out. On the 16th of March, 1881, after the record had been remitted from the Supreme Court, this Court again took the matter into consideration, and renewed and repeated the order made on the 13th of November, with the necessary modifications as to the time of report. The commissioner was directed to proceed promptly and to report as early as practicable.

"Mr. T—— here asked leave to withdraw his petition for vacating the decree or order of the 9th of August, 1880, but as this, in the opinion of the Court, would tend to defeat the purpose of the original investigation, it was refused.

"The report of the commissioner was presented and filed on the 25th of April last. It was laid over for consideration, and was directed to be put on the argument list for the adjourned court in June. At that time the matter was taken up. It was fully argued by Mr. T—— *in persona*, in

[*In re* H—— T——.]

his own behalf, and the views of the committee of the bar were also presented.

"Mr. T—— again asked to withdraw his petition for vacating the decree, and that the rule granted thereon be stricken off. This was again refused for the reasons before given; he also presented a petition asking that the President Judge of another district be called in to hear and decide the case, on the ground that the judge of this Court had advised and taken part in the proceedings, and was so prejudiced against him as to be unable to decide fairly and impartially on the subject. This was also refused, for the reason that the alleged objection was unfounded in fact, and that while the judge regarded the case as unpleasant, from the consideration and decision of which he would be glad to be relieved, yet the law cast the burden of hearing and deciding it upon him, and this, like other unpleasant duties, must be performed with fidelity; that there was nothing in the case giving him the right and privilege of calling upon another judge to perform the duty and assume the responsibility therein, which the law imposed upon him.

"By the report of the commissioner it appears that Mr. T—— and the committee appeared before him and were fully heard. The committee presented a new specification under and in support of the previous general charge, which as condensed and stated in the report is as follows:

"That the said T—— endeavored improperly to influence a sworn officer of the Commonwealth in the discharge of his official duties, to gain an opportunity to practice upon witnesses about to be examined at a coroner's investigation, to gain unlawful advantages for himself, and to impede the administration of justice.

"The commissioner finds, as he had previously found, the fourth specification not sustained. As to the first and second specifications, he finds them conclusively disproved by the verdicts in the criminal cases and not sustained. He affirms and repeats his finding, as to the third specification, that it is sustained by the evidence. His remarks in connection with the finding are worthy of repetition. He says: ' The subject-matter of the third specification, charging T—— with being a fugitive from justice, was not embraced in the indictment, and passed upon in the Court of Quarter Sessions. The accusation that induced his flight was felony. Under the statute, procuring or attempting to procure abortion is made felony. An accessory before the fact is made punishable the same as the principal, and for such crime three bills of indictment were found against him by the grand inquest of the county, the 3d of February, 1880.

[*In re* H—— T——.]

Simultaneous with the return of the coroner's inquisition, implicating the petitioner, he fled from the county. A few days subsequently a warrant was placed in the officer's hands for his arrest. For months his whereabouts are not discovered. Finally, more than eight months after his departure and abandoment of home and business, he returns and recognizes for appearance at Court.

" The commissioner regards the case as one furnishing a successful effort to defeat the ends of justice. With three indictments impending, charging him with felony, for months he eludes arrest. He avoids trial at the February and April sessions of Court. Even in a moral sense, it is damaging to the character of a profession, for ages and everywhere claiming to be honorable.

" As to the fifth specification, the commissioner reports as follows :

" ' This specification and charge rest on the testimony of Mr. Shellenberger.

" ' It establishes in the clearest manner the allegations made. When about to go with the coroner, he met Mr. T——. He was then acting in the capacity of district attorney. He says T—— knew what he was about to do. When T—— asked him if he was going out to S——s, he told him he was. T—— told him he had had connection with that girl out there, and wished the district attorney would not go for half an hour or more ; as the officer said he was ready to start at once, or as soon as the coroner was ready, T—— besought him to delay a little while. Mr. Shellenberger said he could not do that, and the other ought not to ask it. Then T—— said : " I will tell you what to do. Give me an opportunity to send a courier out there to post the parents of this girl not to give me away."

" ' Mr. T——, in the same conversation, said to Mr. Shellenberger, the latter should protect him, and further he stated, if he (T——) could see the people (meaning the S——s) " he could fix it up all right."

" This is the evidence in brief that applies to the fifth specification and charge, and, in the opinion of the commissioner, fully sustains it. Though not an indictable offence, it was an improper and immoral proposition and solicitation. It was made by a lawyer, whose knowledge on the like subjects is supposed to be critical. Its object is apparent on its surface, and, if made to an officer of lax principles, might have defeated the proceedings in contemplation, to the manifest perversion of the course of justice. In this instance, the officer of the law did not lend himself to improper solicitation that the matter would be ' fixed up all right.'

[*In re* H—— T——.]

" ' We may overlook the anxiety a charge so serious may excite in the mind, but the law and its appointed officers are not to be corruptly approached. Here the victim of illicit intercourse was dead. The child and mother met the same fate. Excitement was awakened, and the agency of the officers of the law was invoked. The attempt of the man implicated was to frustrate the legal proceedings, to gain time to send his courier to post the parents, that he might not be given away. Such a proposition cannot be mistaken. It was a corrupt proposition, made to a sworn officer of the law, and, to the credit of that officer, he proceeded in the discharge of his duty.

" In view of the uncontradicted testimony, the commissioner, therefore, finds the fact to be, so far as relates to the fifth specification and charge, ' that the said H—— T——, at the time a member of the bar of Bucks County, on the 29th day of November, 1879, did attempt and endeavor to improperly influence J. Monroe Shellenberger, Esq., a sworn officer of the Commonwealth, to wit, district attorney of Bucks County, in the discharge of his official duties, and also to gain an opportunity to practice upon witnesses about to be examined at the coroner's investigation, to give some unlawful advantage to himself, and to impede the due administration of justice. Your commissioner, therefore, as far as relates to the fifth specification and charge, finds that the same are sustained by the evidence.'

" In conclusion, he recommends that the rule to show cause be discharged. I have carefully read over the whole of the reported testimony taken before the commissioner, both in the original proceedings and on the reconsideration under the later reference, and I fully concur in his findings of facts thereon, and, as before remarked, if there was any doubt under the evidence on the original proceedings as to Mr. T—— having been a fugitive from justice, that doubt has been removed by his own testimony on the rehearing. It is idle to deny that his purpose was to avoid arrest, when, on the very day of the coroner's inquest, he suddenly left his office, his business and his home, and became, therefore, a wanderer, staying awhile at one place, and 'stopping off' at another.

" In regard to the fifth specification, the testimony of Mr. T—— differs somewhat from that of Mr. Shellenberger, but he admits the conversation took place between them, and that he requested Shellenberger to protect him, to see that his name was not brought into the affair, to delay long enough for him to get a friend to go out there and stay during the investigation, and see that they did not give him

away.  This testimony, while it varies the particulars and the expressions used, yet it shows of itself improper importunities to the officer, and an undue influence sought to be exerted upon him.  It does not weaken the testimony of Mr. Shellenberger, or the conclusion the commissioner has drawn therefrom.  The case, as it is now developed, presents two questions for consideration :

" 1. The regularity and validity of the decree of August 11th, 1880, dismissing Mr. T—— from the bar.

" 2. What action should the Court take in the premises, as the case now stands, in view of the evidence given since that decree was made.

" It is to be remarked that Mr. T——'s petition, upon which the rehearing was ordered, did not ask merely that he should be restored to the bar, but was a direct attack upon the validity of the decree dismissing him, and it asked that the same should be immediately and absolutely vacated.  This could only be done on the ground that it had been improperly and imprudently made.  A very reasonable provision, it was thought, had been made to give Mr. T—— actual notice of the charges and proceedings against him.  He was notified in the same manner as is directed by law for the service of a summons in a personal action.  If he was a resident of the county at the time, this was enough ; but he was personally absent, and the commissioner finds he was a fugitive from justice.  An important question is thus presented ; one, upon which I have not found any precedent or decision to guide me, to wit : what power has a Court to dismiss an attorney from the bar, who has been charged with the commission of a crime, and has become a fugitive from justice, in his absence ?  And how is the power to be exercised ?  Surely, the power must exist.  The offender has fled, and voluntarily placed himself beyond the reach of personal notice.  If exercised at all, it must necessarily be in his absence.  To say the alleged offender must have personal notice is to deny the exercise of the power.  If he can not be proceeded against in his absence, then the offender, by successfully avoiding arrest, and remaining away until death has removed the witnesses to his guilt, or time has dulled their memories, may safely return, and, defying alike the Court and his outraged fellows at the bar, may resume the practice of an honorable profession he has disgraced. Perhaps, too, even during his absence in some secure retreat, he may possess the ability to exercise in part the powers and privileges of an attorney of the Court.  The end to be attained by removal from the bar is not punishment, but protection: Per Gibson, C. J., Austin's Case, 5 R., 191.  One

[*In re* H—— T——.]

who voluntarily flies from an accusation of crime, does not thereby confess his guilt, but he does show his unfitness to continue in practice as a member of the bar in the county whence he fled. If he remains and faces his accusers, it would be manifestly improper to strike him from the bar in advance of his trial and conviction on the criminal charge. But when he becomes a fugitive, and successfully avoids arrest, he cannot be thus tried and convicted. The Court may be subjected to the disgrace of having a criminal officer, and the members of the bar a criminal associate-member, unless the same can be avoided by a remedy in his absence. The application of a remedy necessarily and properly includes an inquiry into the facts and circumstances of his alleged offending, but the finding and decree do not subject him to any punishment further than is necessary for the purpose of protection against future wrong-doing, nor do they constitute even presumptive evidence of his guilt in a trial for the offence at another time, and in another forum. I am of opinion, therefore, that the Court had the power to proceed against Mr. T——, and to make the decree dismissing him from the bar in his absence. But, if the fugitive returns, he should then be allowed to meet and, if possible, refute the accusation against him. If he does so successfully, he should be promptly restored to the bar. To give an opportunity, on the one hand, to Mr. T—— for defence, and, on the other, to his accusers to sustain their charges, has been the endeavor of the Court in the action taken upon his petition. The case was recommitted to the commissioner, with power to reopen it from the beginning, so that both sides might be fully heard. Both sides appeared before him, and both submitted all the evidence they had to offer. The commissioner has patiently and laboriously investigated the case. He has taken and submitted a large amount of testimony. He has spent much time in the discharge of his duties. He has presented a clear, intelligent and methodical report. The testimony sustains his findings of fact. To both the commissioner and the committee, the case must necessarily have been an unpleasant one, and an unwelcome one. They have given their services to it from a sense of duty to the Court, to the bar, to the community, and to themselves, without hope or expectation of reward, and, I am confident, without malice or ill-will to Mr. T——. While holding, as I do, that the decree of the 11th of August was valid and proper when made, yet in one particular I find myself unable to agree with the commissioner in his conclusions. Viewing the proceedings subsequent to the presentation of Mr. T——'s petition, as a rehearing of the case, I would give to him the

[*In re* H—— T——.]

benefit of all presumptions to be drawn from his voluntary return and submission to trial in the criminal court. The trial resulted in his acquittal. They judicially established his innocence of the charges from which he fled. His flight was of itself an offence and a mistake, yet it was such as innocent men sometimes commit. I think that, after his voluntary return and his acquittal, it was one for which he ought to be pardoned and released from further disability. It showed not his guilt so much as it showed his weakness, and weakness alone does not render a lawyer liable to be dismissed from the bar. If this were all there was against him, I should direct his restoration. But this is not all. The fifth specification charges the commission of acts not embraced in the first four, previously passed upon by the commissioner. It avers acts, which do not constitute a criminal offence, but which are of such a nature as is dangerous to the community, subversive of justice, and totally unworthy a member of the bar. 'Brutality, drunkenness, the whole circle of infamous crimes,' are mentioned by C. J. Gibson, in Austin's Case, as sufficient cause for expulsion from the bar. In Dickens's Case, 17 P. F. S., 169, an attempt to make an opposing attorney drunk, so as to obtain an advantage over him in the trial of a cause, was held to be good ground for expulsion. Justice Agnew, in delivering the opinion of the Court in the case, says this is a wicked act; one, which strikes directly at the due administration of justice; that the man who would do this thing is unfit to practice in a court where justice is administered, and should be expelled from the bar, or at least suspended until he has shown by good conduct that his offence is thoroughly purged. Here the attempt was not to gain advantage over an opponent by sharp practice, but it was an attempt much more serious, an attempt to corrupt a public officer, to induce him to disregard his duties in order that he, who impliedly at least confesses himself an offender, might escape exposure and disgrace, and the danger which exposure would bring.

"The commissioner has found this specification of the charge true. His findings are founded on clear and sufficient evidence. The investigation of it was embraced in the power given him by the Court in the submission to him. Mr. —— was fully heard before him, and had every opportunity to make his defence. He has also been fully heard by the Court in objection to the proceeding and the report. I have attentively listened to a long and earnest argument from him in person in opposition to the proceedings and in his own defence. He has failed to convince me that there is any doubt as to his offending, or that there is error in the

[*In re* H—— T——.]

proceedings. I am satisfied that the proceedings have been regularly conducted, and with a careful regard to his rights; that the decree of the 11th of August was valid, and was a proper one when made, and should not be set aside for irregularity; that under the subsequent proceedings it was incumbent on him to produce evidence, if he wished to be relieved from that decree; that the records of his subsequent trial and acquittal were enough to induce a change in the findings as to the first and second specifications, and that the offences in the third specification should be condoned.

"I am also of the opinion that the finding under the fifth specification is correct, and that the offence is such as to require Mr. T——'s dismissal from the bar, and a sufficient reason to forbid the making absolute of the rule to show cause why the former order to that effect should not be vacated.

"The rule to show cause granted on his petition to vacate is therefore dismissed, and the order dismissing him from the bar is hereby affirmed and renewed.

"The Court directs that the costs accruing in the proceedings as taxed and reported by the commissioner, and also the prothonotary's costs in the proceedings in this court, be paid by the county."

The respondent then took out a writ of error, assigning twenty errors, covering generally and specifically each step in the proceedings.

*H—— T——,* plaintiff in error, *in propria persona.*

The act of Assembly only provides removal or suspension for misbehavior in office. The matters averred in this proceeding clearly do not come within the duties of professional life. The Court below in entertaining the report, and by their orders, were without precedent in any English or American court.

The report should not have been entertained without affidavit: *Ex parte* Burr, 9 Wheaton, 529; Saxton's Case, 11 Paige, 526; Peterson's Case, 3 Paige, 510; *In re* Brewster, 12 Hun., 109; Walker *v.* Commonwealth, 8 Bush, 86; Turner's Case, 2 Metcalfe (Ky.), 619; Balsbaugh *v.* Fraser, 7 Harris, 99; State *v.* Kirk, 12 Fla., 278.

There should have first been trial and conviction. It is not in the province of the Court to set aside the legal·remedies and punish a lawyer for what he did as a layman: Bacon's Abridgment, title Attorney, H.; *In re* ——, 3 Neville & Perry, 389; *In re* ——, 5 Barn. & Ad., 1088; *In re* ——, 2 Halstead, 163; *In re* Hirst *et al.*, 9 Phila., 216; State *v.* Holding, 1 McCord, 379; Commonwealth *v.* Newton, 1 Grant,

[*In re* H——— T———.]

453; *Ex parte* Steinman, 9 W., N. C., 145; State *v.* Robinson, 26 Texas, 367.

There should have been service of a copy or notice of the charges and specifications: Bradley *v.* Fisher, 13 Wall., 355; Turner's Case, 2 Metcalfe, 619; Peyton's Appeal, 12 Kansas, 406; Turner's Case, 1 Col., 23.

Before his name was stricken from the roll, there should have been a rule to show cause: Bacon's Abridgment, vol. i., 316; Beene *v.* State, 22 Ark., 149; *In re* Percy, 9 Tiffany, 651. *In re* Peterson, 3 Paige, 510; Anon., 22 Wendell, 656.

The matters charged were not within the Act of April 14th, 1834. Misbehavior can only be held to mean violation of his official oath. The matters alleged affected him only as a citizen: Dickens's Case, 17 P. F. Smith, 169; Noyes's Case, 68 Ill., 151; *In re* Knight, 1 Bing., 142; Baker *v.* Commonwealth, 10 Bush., 592; *In re* Woolley, 11 Bush., 95; *In re* Lord, 2 Scott, 131.

The decree should state the cause of expulsion: Perry *v.* State, 3 Greene, 550; State *v.* Watkins, 3 Missouri, 337; Fisher's Case, 6 Leigh, 626.

The fifth specification could not be added, because proceedings of this character are not amendable: State *v.* Kirke, 12 Fla., 278; *In re* Monckton, 1 Moore, P. C., 455; Commonwealth *v.* Newton, 1 Grant, 453; People *v.* Goodrich, 79 Ill., 148.

Nothing appeared upon the record which, under the law and the facts, justified the severe punishment imposed upon the plaintiff by the Court below, involving not only disgrace but loss of practice, and the deprivation of his office as attorney for life.

MAY 8TH, 1882.—The opinion of the Court was delivered by SHARSWOOD, C. J.

This case is before us by writ of error, under the Act of May 19th, 1879, Pamphlet L., 66. That act is very badly framed, and appears to confine the remedy it provides to proceedings against any attorney of said Court "for unprofessional conduct as an officer of the Court." No doubt, attorneys may be disbarred for other causes than unprofessional conduct as an officer. Thus, if convicted in due course of law of any offence of the species *crimen falsi*, the Court would have the right to strike such convict from the roll of attorneys. We do not doubt that it was the intention of the Legislature to provide that this Court should review the proceedings of the inferior courts in striking attorneys from the roll in all cases, and to judge of the sufficiency of the cause. In the case before us, the plaintiff in error was

[*In re* H—— T——.]

arraigned on four specifications.  In regard to the most important of them, it is enough to say that he has been tried and acquitted.  We are bound to consider him as innocent.  If so, his temporary flight is not of such a character as ought to be visited with so heavy a penalty as disbarment.  Nor is the offence of fornication of that character, even supposing that the Court below were competent to try him summarily.  We come then to the fifth specification, which seems to have been subsequently added.  If that showed an offence, an attempt to obstruct the due administration of justice, it was indictable, and the plaintiff in error was entitled to a trial in due course of law.  It was not by any possible construction such misbehavior in his office of attorney as gave the Court summary power to suspend or remove him from office under the 73d section of the Act of April 14th, 1834, Pamphlet L., 354.  The learned Court below seems to have thought that it was not indictable, but that it was an "improper and immoral proposition and solicitation," and that it was made by a lawyer whose knowledge on the like subjects is supposed to be critical.  But how was it misbehavior in his office as attorney ?  Merely discreditable conduct as an individual, outside of his profession, was held in Dickens's Case, 17 P. F. Smith, 169, not to give the Court jurisdiction.  The worst that can be made of the conduct charged in the fifth specification is, that, being suspected of a very grievous and infamous criminal offence, that of complicity in procuring an abortion, he requested the district attorney to give him time that he might see the prosecutor and fix it up right.  We are not to forget that of this alleged crime he has since been found " not guilty."  Even if conscious of innocence, to make such a request of the district attorney was no doubt improper.  Yet some excuse certainly may be found for a young man under such circumstances.  But where is the misbehavior in office ?  We do not see that the Court had jurisdiction under the fifth specification.

This young man has had a severe lesson, and he may yet, hereafter, redeem himself.  He argued his case *in propria persona*, and in the course of it we had occasion to notice that, though the record did not show that he had been served with a copy of the fifth specification, of which defect he might have availed himself, he declined to take advantage of it, but frankly admitted service of a copy.

We need not say that this regard for truth produced a very favorable impression on the Court.

Order of the Court below reversed, and it is ordered that H—— T—— be restored to the bar, and that all costs, charges, and expenses of the proceedings be paid by the County of Bucks.