## Commonwealth *v.* White, Appellant.

Argued November 11, 1971. Before JONES, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Francis S. Wright,* Assistant Defender, with him *John W. Packel,* Assistant Defender, and *Vincent J. Ziccardi,* Defender, for appellant.

*Deborah E. Glass,* Assistant District Attorney, with her *Milton M. Stein,* Assistant District Attorney, *James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

Opinion by Mr. Justice Pomeroy, April 20, 1972:

At approximately 1:30 on the morning of May 8, 1967, two men armed with a shotgun and a toy sheriff's badge forced their way into the home of one Frank White at 811 Summer Street in Philadelphia and robbed him of $2,400. Appellant, no relative of Frank White, was apprehended in connection with the crime and indicted for carrying a concealed deadly weapon, unlawfully carrying a firearm without a license, impersonating an officer, aggravated robbery and conspiracy. A timely motion to suppress the physical evidence seized at the time of his arrest was denied, and on August 23, 1968, a jury found appellant guilty of aggravated robbery. Following the denial of post-trial motions, sentencing was deferred pending a psychiatric examination. On May 15, 1970, appellant was sentenced to 2½ to 12 years at the State Correctional Institution. On appeal, the Superior Court affirmed *per curiam*. We granted allocatur and now reverse.

On the second day of the trial one of the jurors reported to the court that one Herman Hall, manager of the Royal Theater where she previously had worked and where appellant's wife, Ruth White, was presently employed as a cashier, had sought to discuss the case with her. Out of the presence of the rest of the panel, the juror told the court that while walking to the courthouse that morning, she passed the Royal Theater; that Mr. Hall was standing in front of the building; that Hall stopped her and said: "I heard that you was on the White case." The juror stated that when she appeared not to recognize the reference, Mr. Hall explained, "It's the cashier". He then made inquiry whether the jury thought the defendant was guilty, and whether he was carrying a deadly weapon. Then, related the juror, without waiting for a response, Hall told the juror that she should be moving on, for court

was to begin in fifteen minutes. Following this disclosure, the juror was dismissed, and a bench warrant was issued for Mr. Hall.[1]

Later at trial, Mrs. White was called to the stand as an alibi witness. On direct examination she testified that on May 8, 1967, the day of the robbery, she and her husband attended a double-feature motion picture at the Royal Theater from 4:30 p.m. to 10:30 p.m., at which time they returned home, played Monopoly with their children, and retired to bed. On cross-examination, Mrs. White was asked by the Commonwealth whether she knew the juror who had previously been dismissed and who at one time had been an employee of Mr. Hall, her present employer. Admitting a nodding acquaintance, Mrs. White was then asked by the district attorney, "Ma'am, did you happen to call Mr. Herman Hall sometime yesterday after juror No. 8 was selected. Juror No. 8 is the former cashier, who used to work for Mr. Hall, and did you inform him that one of his old cashiers happened to be in your husband's jury?" An objection to this question was sustained and a partial answer was stricken.

The matter of possible corruption of a juror was raised a second time. Herman Hall was called to the stand by the Commonwealth to refute the alibi given by Mrs. White. He testified that two movies, "The Game Is Over" and "The Rage", together with one seven-minute "short", were playing at his theater on May 8, 1967. If appellant and his wife were there, as they testified, from 4:30 to 10:30 p.m., Hall stated that

---

[1] The other jurors were told only that the dismissed member had been approached by a man expressing an interest in the case, that the juror had not acted improperly, but was relieved of her duties to obviate a potentially compromising situation. No suggestion of impropriety on the part of appellant was left with the remaining jurors.

they would have had to see one feature twice and the other feature one and one-half times.[2] This directly conflicted with Mrs. White's recollection that they had seen each picture but once in that six-hour time span. During the defense's presentation, Hall was recalled to the stand in an attempt to elicit information which would lessen the impact of his earlier testimony. He was first asked: "Mr. Hall, would the testimony you gave yesterday concerning the time schedule at the theater which you are manager of, was that testimony accurate?" The witness answered: "No, sir. I was in error." Further examination, however, revealed that Hall was incorrect only as to the order in which the two pictures had been shown, and their respective starting times; his critical testimony that appellant and his wife would have had to see each picture more than once was not altered.

During his cross-examination of Hall on this subject, the district attorney again broached the subject of jury tampering. The witness was asked if he had spoken with Mrs. White at all about the case, and receiving a negative response, inquired what, then, had precipitated the sidewalk conversation with juror No. 8. An objection to this line of questioning was sustained. The prosecution persisted, however, and over repeated objections[3] Hall was allowed to give the following ac-

---

[2] Hall testified that the running time of these movies were one hour and 36 minutes and one hour and 43 minutes, respectively.

[3] While the record reflects appellant's trial objections to the admission of evidence touching on the alleged juror tampering incident, the copy of the motion for a new trial does not allude to the matter. The opinion in the lower court is likewise silent in this respect. In his brief, however, appellant represents that this issue, as well as other trial errors, was raised orally in the lower court and fully briefed and argued before the Superior Court. As the Commonwealth does not dispute this assertion, we consider the matter to be a proper subject for our review.

count: Mrs. White, appellant's wife, had called the night before the incident to say she would not be able to report that evening because her husband was involved in a trial; she mentioned in passing that one of Hall's former employees was serving on the panel. The next day, Hall testified, he was in front of the theater when juror No. 8 approached and volunteered the information that she was serving on the White jury. The following question was then put to Hall by the district attorney: "Now, you stood in a Courtroom and heard that particular young lady [Juror No. 8], under oath, say that you had attempted—initiated the conversation, attempted to discuss with her facts of the case and how the jury felt about the case and you were given an opportunity to speak in your defense and you did not speak. Is that not the fact?" Hall responded in the affirmative, adding that he had remained silent on the advice of counsel.[4]

When exposed to the foregoing testimony, the jury could only have concluded that appellant or his wife or both were involved in a scheme to influence a juror, a crime at common law and by statute in this Commonwealth.[5] The innuendoes and implications contained in

---

[4] It appears from the record that a separate hearing on Hall's activities in conversing with the juror was held by the trial judge when Hall responded to the bench warrant. At this time juror No. 8 testified for the Commonwealth and Hall, on the advice of counsel, claimed his constitutional privilege not to testify. The ultimate disposition of this collateral proceeding is unclear from the record.

[5] The crime is embracery which is defined as follows in The Penal Code, Act of June 24, 1939, P. L. 872, §308, 18 P.S. §4308: "Whoever attempts to corrupt or influence any juror, or any arbitrator appointed according to law, by endeavoring, either in conversation or by written communication, or by persuasion, promise or entreaty, or by any other private means, to bias the mind or judgment of the juror or arbitrator, as to any cause pending in the court to which such juror has been summoned, or in which

the district attorney's questioning indicated that Mrs. White, on behalf of her husband, had told Hall that a former employee of his theater was serving on the jury, and that Hall, pursuant to this information, had contrived an encounter with this juror with the intention of influencing her decision in favor of the appellant.

The highly prejudicial effect of this information in the minds of the jury is undeniable. The question becomes whether the testimony was properly allowed as having probative value. The Commonwealth tries to justify its cross-examination of Hall concerning his part in the incident as impeachment, to demonstrate bias. The flaw in this argument is that Hall was at all times a Commonwealth witness. In recalling Hall to the stand, the defense intended only to conduct further cross-examination, not to make him a defense witness. Moreover, it is apparent that this renewed cross-examination of Hall served merely to bolster the prosecution's attack on appellant's alibi; there was nothing for the Commonwealth to discredit. The general rule in this jurisdiction is that a party cannot discredit his own witness. Subject to certain well-defined exceptions such as surprise and hostility, none of which was here present, a party who calls a witness stands behind his credibility and the truth of his assertions. See in general 2 Henry, *Pennsylvania Evidence*, §§808, 809 (4th Ed. 1953).

The Commonwealth's strategy in cross-examining Hall was to disclose the alleged tampering incident to the jury for use as substantive evidence bearing on

such arbitrator has been appointed or chosen, except by the strength of evidence or the arguments of himself or his counsel during the trial or hearing of the case, is guilty of embracery, a misdemeanor, and on conviction, shall be sentenced to pay a fine not exceeding five hundred dollars ($500), or undergo imprisonment not exceeding one (1) year, or both."

appellant's guilt. The validity of this strategy must be tested as if Hall (or another person not the defendant) had been called by the Commonwealth to give such testimony. So regarded, it was impermissible. It is undoubtedly true that evidence of a party's attempt to embrace a juror is admissible to show his unwillingness to rely on the soundness of his cause. Subornation of a witness and proof of flight as an admission of guilt are analogues. *Power v. Grogan,* 232 Pa. 387, 399, 81 Atl. 416 (1911); *McHugh v. McHugh,* 186 Pa. 197, 203, 40 Alt. 410 (1898); *Commonwealth v. Brown,* 23 Pa. Superior Ct. 470, 502 (1903). Even so, the prejudicial nature of examination along such lines requires the proscription of fishing expeditions such as that which occurred in this case. Assuming that Hall's behavior may have been improper (although the dismissed juror's testimony did not indicate attempted embracery), there was still no proof, only an innuendo, that Mrs. White, appellant's wife, solicited her employer, Hall, for an unlawful purpose. More critically, there was no proof that any approach to Hall by Mrs. White or by Hall to the juror was made with appellant's knowledge and approval. In short, the Commonwealth had no real evidence of embracery by the appellant, and its unsuccessful effort to develop such evidence at trial was prejudicial. The failure to stop this effort when objected to was sufficiently serious error to require a new trial.

Since the case must be retried for the reasons indicated, we need not consider the other trial errors asserted by appellant. Appellant has, however, raised two additional issues which must be disposed of at this time, inasmuch as they involve alleged pre-trial errors of constitutional dimension.

(1) Appellant first contends that his arrest and search were unsupported by probable cause and thus

violative of the Fourth Amendment. At a pre-trial suppression hearing Officer Greco, who along with Officer Kebitch had conducted the arrest and search of appellant, testified for the Commonwealth. (The second officer, Kebitch, was prevented from testifying because he had recently suffered a near-fatal heart attack.) Greco testified that 12 days after the White robbery his partner received a tip that four armed Negro males in a red and white Pontiac bearing a specified license plate would be at the corner of Hicks and Reed Streets in Philadelphia at a certain time for the purpose of burglarizing a store at that location. The informant told Officer Kebitch he would be one of the occupants of the car and that the others would include the two men responsible for the robbery of Frank White. While several other officers went to secure a warrant, Greco and Kebitch staked out the corner. The described automobile and occupants arrived at the reported location but passed on to a different corner. When the men alighted from the car, they were apprehended and a search of appellant's person turned up a gun and toy sheriff's badge. The hearing judge denied a motion to suppress these items, and they were introduced as exhibits at the trial.

It is well established that probable cause may be established by the use of hearsay testimony. *United States v. Ventresca,* 380 U.S. 102, 13 L. Ed. 2d 684 (1965). Appellant attacks here, however, the use of what he terms double hearsay, i.e., one officer testifying as to what an informant told a second officer. Suffice it to say that the testifying officer (Greco) was himself able personally to verify the informant's reliability. "[T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract." *United States v. Ventresca, supra,* 380 U.S. at 108. Under the circumstances, we think there

was here a sufficient basis for crediting even the "hearsay on hearsay". *Jones v. United States,* 362 U.S. 257, 272, 4 L. Ed. 2d 697 (1960).

Having determined the admissibility of the evidence as to probable cause, the question becomes whether the evidence is sufficient under Fourth Amendment standards. We entertain serious doubt that the informant's tip constituted probable cause to arrest appellant for the White robbery. The informant specified only that two of the three others in the car were the culprits in the earlier crime, and he gave no underlying circumstances to justify his conclusion. *Aguilar v. Texas,* 378 U.S. 108, 12 L. Ed. 2d 723 (1964). This defect is not fatal, however, for information was also provided concerning a soon-to-be committed burglary. The information was supplied by a reliable informant who clearly had first-hand knowledge, and activity pointing to a new felony was corroborated by police surveillance. We think it did afford probable cause for the arrest and search of appellant. *Spinelli v. United States,* 393 U.S. 410, 21 L. Ed. 2d 637 (1969) ; *Aguilar v. Texas, supra; Draper v. United States,* 358 U.S. 307, 3 L. Ed. 2d 327 (1959). Furthermore, the informant's declaration was against his own penal interest, since he was an apparent co-conspirator in the planned burglary, and as such may supply an independent basis for finding probable cause. *United States v. Harris,* 403 U.S. 573, 29 L. Ed. 2d 723 (1971).[6]

(2) Appellant's other constitutional objection is to the introduction at trial of a police station identification made by the victim, Frank White. After appellant's arrest, he and the three other occupants of the

---

[6] In light of our conclusion that probable cause for an arrest existed, it follows that the police also had sufficient grounds to justify a stop and frisk. *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889 (1968).

automobile were taken to the station where they were handcuffed and seated on a bench in the waiting room. Frank White was then called and told that several suspects had been taken into custody and were available for his viewing. White went to the station and, upon entering the room where the suspects were seated, he spontaneously and without any questioning by police identified appellant and one Henry Mays as his assailants.[7]

The trilogy of Supreme Court cases which includes *United States v. Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149 (1967); *Gilbert v. California,* 388 U.S. 263, 18 L. Ed. 2d 1178 (1967); and *Stovall v. Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199 (1967), sought to protect the constitutional rights of those accused of crimes by carefully monitoring police practices relative to identification. Because the identification in this case occurred before *Wade, supra,* the test of its validity is whether the confrontation "was so unnecessarily suggestive and conducive to irreparable mistaken identification that he [the defendant] was denied due process of law." *Stovall v. Denno, supra,* at 302. Where, as here, the confrontation of accused and accuser is uncontrived and the ensuing identification does not result from any undue suggestion or other proscribed police practice, we can perceive no due process violation. Appellant protests that Frank White's description to the police immediately after the crime showed his inability to

---

[7] Mays subsequently pleaded guilty to the robbery. He testified for the defense at appellant's trial that a third party, one Willie Smith, a paroled murderer, subsequently given 20-40 years for a different robbery, was his accomplice. Smith, in fact, was present in the courtroom during appellant's trial, and while a similarity in appearance between Smith and appellant is noted in the record, and despite a weak description given to the police following the robbery, the complainant, Frank White, unequivocally identified appellant at trial.

make an accurate identification, and that the man implicated by Mays as his accomplice looked strikingly like appellant. These are matters properly affecting the weight to be given the identification, not its admissibility.

The order of the Superior Court is reversed, the judgment of sentence is vacated and a new trial is granted.

Mr. Justice ROBERTS concurs in the result.

The former Mr. Chief Justice BELL and the former Mr. Justice BARBIERI took no part in the consideration or decision of this case.