**[J-118-2019] [MO: Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 2 EAP 2019 |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Superior Court entered on |
| | : | 8/28/2018 at No. 1028 EDA 2017 |
| v. | : | affirming the Judgement of |
| | : | Sentence entered on 2/2/2017 in the |
| | : | Court of Common Pleas, |
| BRAHIM SMITH, | : | Philadelphia County, Criminal |
| | : | Division at No. CP-51-CR-0006922- |
| Appellant | : | 2014. |
| | : | |
| | | SUBMITTED: December 12, 2019 |

## DISSENTING OPINION

**JUSTICE WECHT**                                              **DECIDED: July 21, 2020**

I do not doubt that the existence of a bench warrant might, in appropriate circumstances, dovetail with a determination that an individual is a "fugitive from justice" prohibited from possessing a firearm under the Uniform Firearms Act. *See* 18 Pa.C.S. § 6105(c)(1). But it cannot be gainsaid that "[a] man is not fleeing from justice until he knows that justice is looking for him or fears that justice is about to look for him." *Commonwealth v. Woong Knee New*, 47 A.2d 450, 466 (Pa. 1946). At times, a warrant is executed to secure the arrest of a "fugitive from justice." At others, a bench warrant may issue for reasons wholly unrelated to any fugitive status, and perhaps unrelated even to the commission of any crime in the first place. The fatal defect of the Commonwealth's case against Brahim Smith is the absence of any evidence of record as to why the warrant was issued or whether Smith had notice of it. Because the record before us is utterly devoid of probative evidence supporting even an inference that Smith knew that a warrant

had been issued for his arrest—and that he intended to flee from it—I cannot join the Court's conclusion that he was a fugitive *per* se, and thus automatically precluded from possessing a firearm. Accordingly, I think it plain that this Court is bound to reverse the judgment of the Superior Court and vacate Smith's misdemeanor conviction under subsection 6105(c)(1).

The status of fugitives was a primary concern of our nation's Founders. From the outset, the extradition of fugitives has been recognized as an obligation of comity between the States. *See Innes v. Tobin*, 240 U.S. 127, 130-31 (1916) ("[P]rior to the adoption of the Constitution fugitives from justice were surrendered between the states conformably to what were deemed to be the controlling principles of comity.") (citing *Kentucky v. Dennison*, 65 U.S. 66, 101-02 (1860), *overruled by Puerto Rico v. Branstad*, 483 U.S. 219 (1987)). To that end, the phrase "fugitive from Justice" formally entered our constitutional lexicon in 1777 with the Second Continental Congress' approval of the fourth article of our fledgling nation's first Charter, which provided:

> The better to secure and perpetuate mutual friendship and intercourse among the people of the different states in this union, the free inhabitants of each of these states, paupers, vagabonds and fugitives from Justice excepted, shall be entitled to all privileges and immunities of free citizens in the several states . . . .

> If any Person guilty of, or charged with, treason, felony or other high misdemeanor in any state, shall flee from Justice, and be found in any of the united states, he shall upon demand of the Governor or executive power of the state from which he fled, be delivered up, and removed to the state having jurisdiction of his offense.

ARTICLES OF CONFEDERATION AND PERPETUAL UNION of 1781, art. IV; *see also* THE FEDERALIST NO. 42 (James Madison).

That provision subsequently was refashioned as the Extradition Clause of the United States Constitution, which commands:

A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.

U.S. CONST. art. IV, § 2. Recognizing that the Clause was not self-enforcing, the second United States Congress adopted the so-called Fugitive Slave Act of 1793, Act of Feb. 12, 1793, Pub. L. No. 2-7, 1 Stat. 302, the first two sections of which established the procedures for securing from "the executive authority of any state in the Union" the return of fugitives from justice "to the state or territory from which he or she shall have fled." *Id.* §§ 1, 2.[1] *See Prigg v. Pennsylvania*, 41 U.S. (16 Pet.) 539, 561, 565-72 (1842) (affirming the supremacy of the Act and striking down as unconstitutional a Pennsylvania law "purport[ing] to punish as a public offence against the state" the kidnapping and rendition of enslaved fugitives).

In considering the effect of the foregoing provisions on the obligations of the executive authorities of asylum states, the Supreme Court of the United States has observed that whether a person is a fugitive from justice "is a question of fact, which the governor of the state upon whom the demand is made must decide, upon such evidence as he may deem satisfactory." *Roberts v. Reilly*, 116 U.S. 80, 95 (1885).

---

[1] Extradition proceedings are now governed by Chapter 209 of Title 18 of the United States Code. 18 U.S.C. §§ 3181-96. In this Commonwealth, the procedures facilitating interstate extradition have since been codified as the Uniform Criminal Extradition Act, 42 Pa.C.S. § 9121, *et seq. Compare id.* § 9123 ("[I]t is the duty of the Governor of this Commonwealth to have arrested and delivered up to the executive authority of any other state of the United States any person charged in that state with treason, felony or other crime, who has fled from justice and is found in this Commonwealth."), *with* 18 U.S.C. § 3182 ("Whenever the executive authority of any State or Territory demands any person as a fugitive from justice . . . the executive authority of the State, District, or Territory to which such person has fled shall cause him to be arrested and secured, and notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear.").

> The simple inquiry must be whether the person whose surrender is demanded is in fact a fugitive from justice, not whether he *consciously* fled from justice in order to avoid prosecution for the crime with which he is charged by the demanding state. A person charged . . . with the commission within a state of a crime covered by its laws, and who, after the date of the commission of such crime, leaves the state—no matter for what purpose or with what motive, nor under what belief—becomes, from the time of such leaving, and within the meaning of the Constitution and the laws of the United States, a fugitive from justice . . . . Such is the command of the supreme law of the land, which may not be disregarded by any state. The constitutional provision relating to fugitives from justice, as the history of its adoption will show, is in the nature of a treaty stipulation entered into for the purpose of securing a prompt and efficient administration of the criminal laws of the several states—an object of the first concern to the people of the entire country, and which each state is bound, in fidelity to the Constitution, to recognize.

*Appleyard v. Massachusetts*, 203 U.S. 222, 227-28 (1906) (cleaned up; emphasis in original); *but see Bassing v. Cady*, 208 U.S. 386, 391-93 (1908) (suggesting that asylum State governor might be permitted to deny an extradition demand when the requisition State's warrant is predicated on criminal offenses for which the alleged fugitive previously had been charged, assuming jeopardy had attached prior to the dismissal of the first indictment).

The Court also has clarified that:

> [F]or purposes of extradition between the states, it does not matter what motive induced the departure. . . . The Constitution . . . peremptorily requires that upon proper demand the person charged shall be delivered up to be removed to the state having jurisdiction of the crime. There is no discretion allowed, no inquiry into motives.

*Drew v. Thaw*, 235 U.S. 432, 439-40 (1914) (citations omitted). Having been charged with a crime in one State, it is sufficient that an alleged fugitive simply be found in another State. *Strassheim v. Daily*, 221 U.S. 280, 285 (1911); *Ex parte Reggel*, 114 U.S. 642, 651-53 (1885); *but see Hyatt v. New York*, 188 U.S. 691, 713 (1903) (holding that a defendant cannot be extradited as a "fugitive from justice" if "in fact he was not within the

[requisition] state at the time the [criminal] act is said to have been committed"). Thus, a fugitive may be surrendered upon an extradition warrant even if he had been brought into the asylum State against his will, *Innes*, 240 U.S. at 135 (noting that, to hold otherwise "would cause them all to become involuntary asylums for criminals"), regardless of the alleged forbidden act made punishable by law in the State from which he fled. *Taylor v. Taintor*, 83 U.S. (16 Wall.) 366, 375 (1872) ("Every violation of the criminal laws of a State is within the meaning of the Constitution, and may be made the foundation of a requisition."). *See generally Illinois ex rel. McNichols v. Pease*, 207 U.S. 100, 108-09 (1907) (delineating seven "principles" controlling the interstate extradition of "fugitives from justice").

Although the foregoing authority largely arose in the context of interstate extradition proceedings, this Court's jurisprudence on the subject of fugitives developed in tandem with that indelible feature of American federalism.[2] Consequently, our predecessors have had occasion to distinguish the prevailing federal "fugitive from justice" standard from Pennsylvania's consideration of wholly intrastate requisitions. *Commonwealth v. Jailer*, 1 Grant 218 (Pa. 1855), for instance, concerned a warrant issued by the President Judge of Allegheny County directing the sheriff to convey a fugitive "imprisoned in the common jail of" that county, "upon a charge of adultery, committed in Washington County," to the custody of the latter's county jail. *Id.* at 219. Acknowledging that such a transfer would be permissible "[i]f the offence charged . . . were a felony," *id.*, this Court ordered the woman's release on the grounds that the lower court had no power, either by statute or "at common law," to order the

---

[2] In light of this historical development, I disagree with the lower court's rejection of Smith's argument as "legally unpersuasive" simply because his "discussion of the phrase 'fugitive from justice'" arose from "caselaw and statutory authority relating to extradition." *Commonwealth v. Smith*, 1028 EDA 2017, 2018 WL 4089657, at *4 n.6 (Pa. Super. Aug. 28, 2018).

rendition of an alleged fugitive where the conduct at issue was a lower-graded offense. *Id.* at 219-20. For non-felonies, however, the Court noted that

> the means provided for the arrest and return of fugitives from justice, is a warrant issued by a justice of the peace of the county where the offence is alleged to have been committed, and endorsed or backed by a justice or alderman of the county where the offender is found.

*Id.* at 220. While *Jailer* is in accord with the federal standard that authorities must demonstrate a nexus to some criminal offense, this Court appeared to signal an early divergence from the federal courts' view that flight from *any* criminal offense would support the execution of a bench warrant for the capture and conveyance of alleged fugitives within the Commonwealth.

Revisiting the fugitive question in *Blackman v. Commonwealth*, 17 A. 194 (Pa. 1889), this Court held that prosecutors make out a *prima facie* case that a defendant was a fugitive by "prov[ing] that he fled from his usual place of residence within this state for the manifest purpose of avoiding arrest." *Id.* at 195. By obligating the Commonwealth to demonstrate a defendant's "manifest purpose" in fleeing—*i.e.*, to avoid arrest—the *Blackman* Court broke from the High Court's fugitive jurisprudence, which required no proof of *scienter*. *Compare id.*, *with Appleyard*, 203 U.S. at 227, *and Drew*, 235 U.S. at 439. As far as Pennsylvania was concerned, a warrant alone would not suffice to prove that an individual had intended to flee "from justice." Foreshadowing the circumstances presently before us, the Court notably inquired as to whether a defendant, "hiding within the state, instead of outside of it," would be "in a position to raise the question whether a fugitive from justice, who effectually secretes himself within the state, and thus baffles all attempts to arrest him until the statute [of limitations] has run, can then emerge from his hiding place, and successfully plead the statute of limitations." *Id.* Because the issue was not raised directly in that case, the Court declined to answer its own pregnant query.

This Court appeared to resolve the question definitively in *Commonwealth v. Weber*, 103 A. 348 (Pa. 1918). In that case, Weber, a resident of Pittsburgh who frequented "his old home in West Deer [T]ownship, where he owned an interest in a farm," was charged with "seduction and fornication and bastardy," offenses that he allegedly committed in the township in July 1910. *Id.* at 349. After learning that a criminal information had been sworn and a warrant issued for his arrest in April 1911, Weber "left home . . ., going to Youngstown, Ohio," until November 1913, "when he took up his residence in Pittsburgh and continued to reside in that city" as of the time of his arrest in 1916. *Id.* On appeal, Weber asserted that his convictions should be overturned based upon the two-year statute of limitations for the crimes charged. Drawing from the circumstances in *Blackman*, the *Weber* Court rejected the notion that "one charged with crime committed in a rural district, who flees from arrest, but subsequently takes up his residence in a large city within the state," can invoke the statute of limitations to avoid prosecution. *Id.* at 349-50. Thus, so long as a person intentionally flees from his usual place of residence when the authorities attempt to initiate criminal process, he may be considered a *bona fide* fugitive from justice, even if he does not leave the Commonwealth's jurisdiction.

Turning to the instant matter, the pertinent inquiry is whether Smith, who was found in constructive possession of a firearm on the public streets of Philadelphia, was in that moment a "fugitive from justice" as that phrase commonly is, and historically has been, understood. Apart from the seizure of the firearm itself, the totality of the Commonwealth's evidence against Smith for the offense charged under subsection 6105(c)(1) was the following two-sentence stipulation:

> [A]t the time of this offense on April 21st of 2014, the defendant, Brahim Smith, had an active bench warrant, which was issued on April 3rd of 2014 under CP-51-[CR-]0003923-2011. That bench warrant was lifted on May 1st of 2014, which would make him ineligible for -- a prohibited person from

carrying a firearm under 6105 graded as a misdemeanor of the first degree.[3]

Notes of Testimony ("N.T."), 10/14/2016, at 20-21. The Commonwealth's argument, at base, is that the existence of the bench warrant, without more, was sufficient to render Smith a fugitive from justice for purposes of the Uniform Firearms Act. The Majority adopts this dubious formulation, reasoning that:

> a bench warrant issues only when an individual does not appear when required, and thus acts to elude or evade law enforcement or prosecution. It logically follows that an individual who evades law enforcement such that a bench warrant is issued . . . is a fugitive as that term is commonly defined.

Maj. Op. at 13.[4] The Majority's conclusion rests upon several flawed assumptions.

As a threshold matter, contrary to the Majority's suggestion, bench warrants do not issue in criminal cases "only" when someone fails to appear when required. Several of our Rules of Criminal Procedure provide that bench warrants may issue for the failure to pay fines and court costs.[5] *See, e.g.*, Pa.R.Crim.P. 706, Comment ("Under this rule, when a defendant fails to pay the fine and costs, the common pleas court judge may issue a bench warrant for the collection of the fine and costs."); *cf. id.* at 142(A)(1)-(2) (bench warrant "shall be issued" where a contemnor fails to pay fines imposed as a punishment for contempt). In summary cases, bench warrants may be executed when a

---

[3]  *See* 18 Pa.C.S. § 6119 ("Except as otherwise provided, an offense under this subchapter constitutes a misdemeanor of the first degree.").

[4]  The Majority castigates this dissent for "going so far as to" elide from the block-quoted text the phrase "as appellant stipulated to do here." Maj. Op. at 13 n.10. Because I do not share the Majority's view that Smith specifically stipulated to "evad[ing] law enforcement," *id.* at 13—which necessarily would have satisfied an essential *mens rea* element—I cannot consider that comment to be a fair characterization of the parties' stipulation.

[5]  *See generally* Pa.R.Crim.P. 150 (outlining procedures in cases where bench warrants are executed).

defendant has entered a guilty plea by mail and the money forwarded with the plea is less than the amount of the fine and costs specific in the citation or summons; or the defendant has been sentenced to pay restitution, a fine, or costs and has defaulted on the payment; or the issuing authority has, in the defendant's absence, tried and sentenced the defendant to pay restitution, and/or to pay a fine and costs and the collateral deposited by the defendant is less than the amount of the fine and costs imposed.

*Id.* at 430(B)(3)(a)-(c). Bench warrants also are issued to secure individuals who violate conditions of bail, *id.* at 536(A)(1)(b), including non-monetary conditions such as travel restrictions, home confinement, curfew, and electronic monitoring. *See Commonwealth v. Sloan*, 907 A.2d 460, 462 (Pa. 2006). It logically follows that while a court may issue a bench warrant based upon a defendant's efforts "to elude or evade law enforcement or prosecution," Maj. Op. at 13, those acts are a sufficient condition, but not a necessary one.

Nor are bench warrants confined to the enforcement of the criminal law. In the family courts across this Commonwealth, judges regularly depend upon bench warrants as tools to compel attendance and to assist in the collection of support payments in domestic relations matters, matters completely untethered from the criminal law. *See* Pa.R.C.P. 1910.13-1. Based upon the Majority's broad holding, I shudder to think that a party to a custody dispute or support action who inadvertently misses a scheduling conference or a child support payment now would be considered a "fugitive from justice," subject to prosecution for possessing a firearm regardless of whether he or she knew that a warrant had issued and absent even a hint of criminal wrongdoing. This result is unintended and untenable.

Moreover, in each century of its existence, this Court has considered appeals involving the use of bench warrants where the failure of a party or witness to appear was not in dispute. For example, trial courts may issue bench warrants proactively to ensure the attendance of reluctant victims and witnesses in both criminal and civil cases, *see,*

*e.g.*, *Commonwealth v. Cargo*, 444 A.2d 639, 641 n.8 (Pa. 1982) (sixteen-year-old witness to murder ordered to appear ahead of trial); to compel testimony regarding juror bias, *Commonwealth v. White*, 290 A.2d 246, 248 (Pa. 1972) (bench warrant issued to dismissed juror's employer following disclosure that the two may have discussed case); to guarantee service of process, *Schlesinger v. Musmanno*, 81 A.2d 316, 318 (Pa. 1951) (bench warrant issued in civil trespass case for petitioner's arrest after he refused service by deputy sheriff); and to initiate contempt proceedings, *Legaux v. Feasor*, 1 Yeates 586, 588 (Pa. 1795) (following dismissal of jury, bench warrant issued against a witness for "wilful and corrupt perjury").

Bench warrants even have been issued at the insistence of the parties themselves, sometimes for the express purpose of securing evidence or exposing fraudulent behavior. *See Appeal of McIntyre*, 22 A.2d 200, 200-01 (Pa. 1941) (bench warrant executed upon complaint that election board was committing fraud and failed to compute returns); *Willis v. Kane*, 2 Grant 60 (Pa. 1853) (bench warrant issued upon affidavit alleging that attorney had fraudulently concealed property from creditors); *see also Thompson v. Thompson*, 223 A.3d 1272, 1274 (Pa. 2020) (discussing agreement signed by appellee in which she "admitted that she was in civil contempt" of a support order and providing that a bench warrant would be issued for her immediate arrest if she "failed to remain current in her obligation"). That is to say, notwithstanding a court's inherent authority to issue a bench warrant to secure the arrest of a "fugitive from justice" in a criminal case, it is clear that bench warrants are used for a multitude of reasons in the law other than one's failure to appear when previously ordered. Equally clear is that the issuance of a bench warrant is not necessarily tethered to one's commission of a criminal act at all. Whatever other attributes of a "fugitive from justice" that the Majority emphasizes or dismisses, certainly

the phrase is intended to refer only to a criminal actor, not a parent who misses a custody hearing, or a witness to a crime who fails to appear and testify at trial due to intimidation.

Unfortunately, the Majority draws no practical distinction between these disparate circumstances. Under the Majority's expansive reading, a bench warrant predicated upon the mere inability to pay fines and fees (other than for summary traffic offenses) would just as soon turn a constitutionally protected activity—namely, the right to keep and bear arms—into a criminal act as it would if it had been triggered by one's deliberate flight to avoid prosecution. Every technical probation or parole violator instantly would be rendered a "fugitive from justice" upon the issuance of a bench warrant, which may be *pro forma* in some jurisdictions, or dependent upon the vicissitudes of busy trial court schedules in others. Anyone who inadvertently misses a domestic relations hearing or a child support payment could face a weapons charge, even though the offender might otherwise be permitted to lawfully possess a firearm. The possibilities are alarmingly endless, and they flow naturally from the Majority's unbounded ruling.

The Majority dismisses these considerations out of hand as "hyperbolic." Maj. Op. at 11 n.9. And yet, in defining "fugitive" and "fugitive from justice" broadly to "include someone who evades *the law* or prosecution," Maj. Op. at 13 (emphasis added), the Majority provides no meaningful guidance to those who might unwittingly trigger its application. Nor would that indeterminable designation cabin the Commonwealth's discretion as to who could be prosecuted as a fugitive from "the law." As Justice Baer aptly notes, the Majority's "rigid" classification "effectively creates a *per se* rule that any individual who is subject to an active bench warrant is a fugitive from justice, irrespective of" their knowledge or intent. Diss. Op. at 1 (Baer, J., dissenting). Although the Majority faults both dissents for gleaning this unmistakable consequence from its holding, it remains self-evident that the Majority's cursory analysis embraces such a categorical

approach. But just how many Pennsylvanians would the Majority's new rule immediately impact? The Majority does not say. According to data compiled by the Department of Justice, *infra*, however, the answer is in the tens of thousands at any given time—not to mention the millions of Americans with open warrants presently residing beyond our borders.

Thus, my concerns regarding the unintended consequences of the Majority's holding echo those of Justice Sotomayor, who considered the profusion of open warrants throughout the United States in her dissent in *Utah v. Strieff*, ___ U.S. ___, 136 S.Ct. 2056 (2016), a Fourth Amendment case involving a suspicionless police stop. Joined by Justice Ginsburg, Justice Sotomayor warned of the inherent risk of abuse by law enforcement created by a glut of open warrants, citing abundant evidence from the Justice Department as well as non-governmental organizations demonstrating that, as of 2014, there were "over 7.8 million outstanding warrants" nationwide, "the vast majority of which appear to be for minor offenses." *Id.* at 2068 (Sotomayor, J., dissenting) (citing Dep't of Justice, Bureau of Justice Statistics, Survey of State Criminal History Information Systems, 2014 (2015) ("Systems Survey") (Table 5a)).[6] Pertinently, the Systems Survey showed that there were more than 100,000 open warrants in Pennsylvania alone—more than eighty percent of which were for non-felony matters. *Id.* As Justice Sotomayor aptly noted:

> Outstanding warrants are surprisingly common. When a person with a traffic ticket misses a fine payment or court appearance, a court will issue a warrant. When a person on probation drinks alcohol or breaks curfew, a court will issue a warrant. . . . The Department of Justice recently reported that in the town of Ferguson, Missouri, with a population of 21,000, 16,000 people had outstanding warrants against them.

---

[6]    The Department of Justice's 2015 Systems Survey is available online at https://www.ncjrs.gov/pdffiles1/bjs/grants/249799.pdf.

*Strieff*, 136 S.Ct. at 2068-69 (Sotomayor, J., dissenting) (citations omitted).  Given that the Majority in this case automatically would deem any and all individuals to be "fugitives from justice" upon the mere issuance of a bench warrant, the potential repercussions of the Majority's holding on a statewide scale are exceptionally vast and readily apparent.

Unwilling to confront these inconvenient truths on their merits, the Majority instead simply derides them as "riffs" and "magical thinking."  Maj. Op. at 13 n.10.  As it labors to divine Smith's knowledge and intent from the scant record before us, the Majority effectively transmogrifies a somewhat muddled stipulation into an ironclad guilty plea.  "By agreeing to the stipulation," the Majority asserts, Smith "also assented to the facts supporting it, and obviated the Commonwealth's burden to demonstrate that underlying fact."  *Id.*  The Majority cites a number of inapposite decisions to rationalize stretching the stipulation far beyond its natural limits.  *See id.  Phillips v. Schoenberger*, 534 A.2d 1075 (Pa. Super. 1987), for instance, stands for the proposition that the facts underlying a stipulation, once agreed to by the parties, cannot be diminished or enlarged without the assent of both sides.  *Id.* at 1078-79.  But that is precisely what the Majority does here on the Commonwealth's behalf when it assumes—without any support whatsoever—that the bare stipulation somehow established Smith's *mens rea.  See* Maj. Op. at 4 (quoting N.T. 10/14/2016, at 23); *see also id.* at 7 n.8.  Notably, that portion of the bench trial quoted by the Majority in support of its bald assumption came not from the parties' stipulation, but was made by the Commonwealth during argument.  As the Majority well knows, "a prosecutor's comments do not constitute evidence," *Commonwealth v. Baez*, 720 A.2d 711, 729 (Pa. 1998), nor can they be used to supplement the explicit terms of a stipulation agreed to by the defense.[7]

---

[7]     The Majority's reference to *Commonwealth v. Padilla*, 80 A.3d 1238 (Pa. 2013), the lone criminal case cited in support of its expansive view of stipulations generally, similarly is misplaced.  There the parties had stipulated *explicitly* "that evidence exists

Critically, the Majority's position also is out of step with persuasive federal precedent on a very similar question. In an analogous case, *Rehaif v. United States*, ___ U.S. ___, 139 S.Ct. 2191 (2019), the Supreme Court of the United States considered the fate of Hamid Rehaif, who "entered the United States on a nonimmigrant student visa to attend university" and later was convicted of a possessory firearm offense under federal law. *Id.* at 2194. After dismissing Rehaif from the school for poor grades, the university informed him "that his 'immigration status' would be terminated unless he transferred to a different university or left the country. Rehaif did neither." *Id.* (record citation omitted). The Government subsequently discovered that Rehaif had "visited a firing range, where he shot two firearms" for target practice, and then "prosecuted him for possessing firearms as an alien unlawfully in the United States, in violation of" the Gun Control Act of 1968, 18 U.S.C § 922, *et seq.* "At the close of Rehaif's trial, the judge instructed the jury (over Rehaif's objection) that the 'United States is not required to prove' that Rehaif 'knew that he was illegally or unlawfully in the United States." *Rehaif*, 139 S.Ct. at 2194 (citation omitted). Consequently, the jury found him guilty, and the court sentenced him to eighteen months' imprisonment. *Id.*

---

beyond a reasonable doubt that" Padilla had killed three people "while in the perpetration of the felony of a person not to possess and/or use a firearm . . . a felony of the second degree." *Id.* at 1271 (citing N.T. 9/13/2006, at 20). "The Commonwealth presented no evidence as to any firearm offense, but relied exclusively on the above stipulation to establish the" aggravating factor under 42 Pa.C.S. § 9711(d)(6) (killing while in the perpetration of a felony). *Padilla*, 80 A.3d at 1271. As it turned out, the predicate offense to which Padilla had stipulated—possession of a firearm by an alien "illegally or unlawfully in the United States," 18 Pa.C.S. § 6105(c)(5)—was only a misdemeanor, and thus would not have established the aggravating factor if its grading had been accurately conveyed to the jury. *Padilla*, 80 A.3d at 1271. Notwithstanding that oversight, this Court rejected Padilla's efforts to "employ" his sufficiency challenge "as an alternative route to obtain review of trial court or counsel error." *Id.* at 1272. Because the stipulation—"**as read to the jury**"—was sufficient to support its findings, this Court concluded that his challenge necessarily "must fail." *Id.* (emphasis in original). Here again, conversely, the parties' stipulation, by its plain terms, provides no support for the Majority's conclusion that Smith knew of the warrant and intended to flee from it.

On appeal, Rehaif contended that the judge erroneously had instructed the jury "that it did not need to find that he knew he was in the country unlawfully." *Id.* at 2195. At issue before the Supreme Court was the interplay between subsection 922(g) of the Act, which prohibits certain individuals, "including felons and aliens who are 'illegally or unlawfully in the United States,'" from possessing firearms, *id.* at 2194 (quoting 18 U.S.C. § 922(g)), and subsection 924(a), which separately "adds that anyone who '*knowingly* violates' the first provision shall be fined or imprisoned for up to 10 years." *Id.* (quoting 18 U.S.C. § 924(a)(2)) (emphasis in original). The question was whether those two provisions required the Government to "prove that a defendant knew both that he engaged in the relevant conduct (that he possessed a firearm) and also that he fell within the relevant status (that he was a felon, an alien unlawfully in this country, or the like)?" *Id.*

In a 7-2 opinion authored by Justice Breyer, the Court reversed Rehaif's conviction, holding "that the word 'knowingly' applies both to the defendant's conduct and to the defendant's status." *Id.* The Court observed that:

> Whether a criminal statute requires the Government to prove that the defendant acted knowingly is a question of congressional intent. *See Staples v. United States*, 511 U.S. 600, 605 (1994). In determining Congress' intent, we start from a longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state regarding "each of the statutory elements that criminalize otherwise innocent conduct." *United States v. X-Citement Video, Inc.*, 513 U.S. 54, 72 (1994); *see also Morissette v. United States*, 342 U.S. 246, 256-58 (1952). We normally characterize the interpretive maxim as a presumption in favor of "scienter," by which we mean a presumption that criminal statutes require the degree of knowledge sufficient to "mak[e] a person legally responsible for the consequences of his or her act or omission." Black's Law Dictionary 1574 (10th ed. 2014).
>
> We apply the presumption in favor of scienter even when Congress does not specify any scienter in the statutory text. *See Staples*, 511 U.S. at 606. But the presumption applies with equal or greater force when Congress includes a general scienter provision in the statute itself.

*Id.* at 2195 (parallel citations omitted). By clarifying that, in order to secure a conviction, the Government "must show that the defendant knew he possessed a firearm and also that he knew he had the relevant status when he possessed it," *id.* at 2194, the Court also looked "[b]eyond the text," observing that its reading of the two provisions was "consistent with a basic principle that underlies the criminal law, namely, the importance of showing what Blackstone called 'a vicious will.'" *Id.* at 2196 (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 21 (1769)).

The Court reiterated the fundamental principle "that an injury is criminal only if inflicted knowingly," characterizing it "as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." *Id.* (internal quotation marks and citation omitted).

> Scienter requirements advance the basic principle of criminal law by helping to "separate those who understand the wrongful nature of their act from those who do not." (quoting *X-Citement Video*, 513 U.S. at 72-73, n.3).
>
> The cases in which we have emphasized scienter's importance in separating wrongful from innocent acts are legion. We have interpreted statutes to include a scienter requirement even where the statutory text is silent on the question. *See Staples*, 511 U.S. at 605. And we have interpreted statutes to include a scienter requirement even where "the most grammatical reading of the statute" does not support one. *X-Citement Video*, 513 U.S. at 70.

*Id.* at 2196-97 (parallel and string citations omitted). Significantly, the Court reasoned that:

> Applying the word 'knowingly' to the defendant's status in [subsection] 922(g) helps advance the purpose of scienter, for it helps to separate wrongful from innocent acts. Assuming compliance with ordinary licensing requirements, the possession of a gun can be entirely innocent. It is therefore the defendant's *status*, and not his conduct alone, that makes the difference. Without knowledge of that status, the defendant may well lack

the intent needed to make his behavior wrongful. His behavior may instead be an innocent mistake to which criminal sanctions normally do not attach.

*Id.* at 2197 (citation omitted; emphasis in original); *see also id.* at 2197 (quoting OLIVER WENDELL HOLMES, JR., THE COMMON LAW 3 (1881) ("even a dog distinguishes between being stumbled over and being kicked")).

*Rehaif* is particularly instructive because the same provision that makes it unlawful for felons and certain aliens to possess firearms under federal law likewise precludes "any person . . . who is a fugitive from justice" from doing so as well. 18 U.S.C. § 922(g)(2). Subsection 922(g)(2) was promulgated in 1993 with the passage of Brady Handgun Violence Prevention Act ("Brady Act"), Act of Nov. 30, 1993, Pub. L. No. 103-159, 107 Stat. 1536, which amended the Gun Control Act to require "a statement that the transferee" of a firearm, *inter alia*, "is not a fugitive from justice." 18 U.S.C. § 922(s)(3)(B)(ii). The 1993 amendments also added a familiar definition for "fugitive from justice," which "means any person who has fled from any State to avoid prosecution for a crime or to avoid giving testimony in any criminal proceeding." *Id.* § 921(a)(15). Within two years of the Brady Act's passage, our General Assembly added subsection 6105(c)(1) to the Uniform Firearms Act to bring Pennsylvania law into conformity with its federal analogue.[8]

Notwithstanding the Uniform Firearms Act's provision that "the fact that [a] person was armed with a firearm, . . . and had no license to carry the same, shall be evidence of

---

[8] The legislative record is silent as to whether the General Assembly contemplated the definition of "fugitive from justice" contained in the federal statute when it amended the Uniform Firearms Act to criminalize the same from possessing a firearm in Pennsylvania. Perhaps recognizing the sheer breadth of the federal standard, the legislature further amended the Act in 1998 to clarify that "the prohibition of subsection 6105(a) . . . does not apply to an individual whose fugitive status is based upon a nonmoving or moving summary offense under Title 75 (relating to vehicles)." 18 Pa.C.S. § 6105(c)(1); *see* Act of Dec. 3, 1998, Pub. L. 933, No. 121, § 4.

that person's intention to commit the offenses" enumerated in Section 6105 of the Act, 18 Pa.C.S. § 6104, this Court has long considered a defendant's *mens rea* in assessing whether he was, in fact, a fugitive from justice in Pennsylvania.[9]  *See Woong Knee New*, 47 A.2d at 466.  As our intermediate appellate courts historically have recognized, "[t]here can be no doubt that one charged with crime who escapes from an officer *after being notified* that he is under arrest for the offense is a fugitive from justice."  *Commonwealth v. McCormick*, 71 Pa. Super. 567, 569-70 (1919) (*en banc*) (emphasis added).  Indeed, one cannot "become a fugitive" unless he "*voluntarily* flies from an accusation of crime." *In re H.T.*, 2 Pennyp. 84, 95-96 (Pa. 1882) (emphasis added).[10]  Conversely, "[a]n accused, unaware that process has been issued against him, has no obligation to make himself available."  *Commonwealth v. Cohen*, 392 A.2d 1327, 1330 (Pa. 1978); *cf. Rehaif*, 139 S.Ct. at 2198 ("The defendant's status . . . refers to a legal matter, but this legal matter is what the commentators refer to as a 'collateral' question of law.  A defendant who does not know that he is an alien 'illegally or unlawfully in the United States' does not have the

---

[9]     *Compare* 18 Pa.C.S. § 302 ("General requirements of culpability"), *with id.* § 305 ("Limitations on scope of culpability requirements").

[10]     The voluntariness of a defendant's flight is a common refrain in our fugitive-from-justice jurisprudence.  *See Commonwealth v. Deemer*, 705 A.2d 827, 828, 828-29 (Pa. 1997) (holding that a trial court may deny a defendant's motion to file post-trial motions *nunc pro tunc* where he "had willfully and purposely become a fugitive," thus "voluntarily absent[ing] himself from the jurisdiction" of the court); *Commonwealth v. Kindler*, 639 A.2d 1, 3 (Pa. 1994) (Opinion Announcing the Judgment of the Court) (recognizing "that one who invokes the jurisdiction of a tribunal and then flees has voluntarily waived or disentitled himself to call upon the resources of the [c]ourt for a determination of his claims"); *Commonwealth v. Jones*, 610 A.2d 439, 441 (Pa. 1992) ("A defendant's voluntary escape acts as a *per se* forfeiture of his right of appeal, where the defendant is a fugitive at any time after post-trial proceedings commence."); *Commonwealth v. Passaro*, 476 A.2d 346, 349 (Pa. 1984) (holding that, "by *choosing* to flee and live as a fugitive, a defendant forfeits the right to have his claims considered" because his "resort to escape constitutes a *flagrant* and *deliberate* bypass of the entire judicial process") (emphasis added).  *See generally* RICHARD D. FREER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE (WRIGHT & MILLER): CRIMINAL § 3533.4.2 (3d ed. Apr. 2020 update) (collecting federal cases discussing the fugitive disentitlement doctrine).

guilty state of mind that the statute's language and purposes require."). I see no good reason to depart from this well-settled jurisprudence, particularly where the conduct at issue—possession of a firearm—is not inherently a criminal offense. *See Commonwealth v. Hicks*, 208 A.3d 916, 936-37 (Pa. 2019).

In view of this abundant decisional law, it is clear that, in order to establish a violation of subsection 6105(c)(1), the Commonwealth must adduce some evidence that the defendant: (a) was subject to criminal process; (b) had been on notice of the proceedings at the time of his disappearance; and (c) knew of his fugitive status "when he possessed" the firearm. *See Rehaif*, 139 S.Ct. at 2194; *Blackman*, 17 A. at 195; *see also Cohen*, 392 A.2d at 1330. Succinctly put, a criminal nexus, notice, and knowledge of one's prohibited status are essential elements in a prosecution under subsection 6105(c)(1).[11] If the Commonwealth can show, for instance, that a defendant in a criminal case, including a probationer or parolee, had received notice that his failure to appear could result in his arrest and then in fact failed to appear, such evidence would tend to establish a presumption of an intent to evade justice. *Cf. Commonwealth ex rel. Flower v. Superintendent of Phila. Cty. Prison*, 69 A. 916, 917 (Pa. 1908) (noting that an extradition "warrant is presumptive but not conclusive evidence that the person is a fugitive from justice"). While actual knowledge of the open warrant would lend greater

---

[11] As our procedural rules demonstrate, notice—actual or constructive—already is a prerequisite to establishing the validity of a bench warrant. *See* Pa.R.Crim.P. 140(B); 142(A); 543(D)(3); *see also id.* at 430(B)(4) ("No warrant shall issue under paragraph (B)(3) unless the defendant has been given notice in person or by first class mail that failure to pay the amount due or to appear for a hearing may result in the issuance of a bench warrant, and the defendant has not responded to this notice within 10 days."); Pa.R.C.P. 1910.13-1(a)(1) (bench warrant may issue for failure to appear at conference or hearing in a domestic relations matter if the court finds "following a hearing on the record that the party had actual notice that the party was ordered to attend the conference and/or hearing"); *see also id.* at 234.5(a) ("If a witness fails to comply with a subpoena, the court may issue a bench warrant and if the failure to comply is wilful may adjudge the witness to be in contempt."); *but see* 42 Pa.C.S. § 5904(d) (bench warrant may not issue for failure to respond to a subpoena "if service has been by first class mail").

weight to the presumption, a defendant nonetheless may seek to rebut that presumption with relevant evidence. *See Deemer*, 705 A.2d at 829 n.3 (raising, without answering, "the question of whether a returned fugitive who is able to offer compelling reasons for his fugitive status (*i.e.*, he was a fugitive for reasons beyond his control) might be allowed an extension of time for filing" an appeal); *cf. Bassing*, 208 U.S. at 391-93; *Hyatt*, 188 U.S. at 713.

Like the *Rehaif* Court, I "doubt that the obligation to prove a defendant's knowledge of his status will be as burdensome as" the Commonwealth or today's Majority might think. *Rehaif*, 139 S.Ct. at 2198. After all, "knowledge can be inferred from circumstantial evidence." *Staples*, 511 U.S. at 615 n.11; *see Commonwealth v. Rizzuto*, 777 A.2d 1069, 1078 (Pa. 2001) ("Evidence of flight shows a consciousness of guilt.") (cleaned up); *see also Commonwealth v. DeJesus*, 880 A.2d 608, 615 (Pa. 2005) (noting that "other evidence presented by the Commonwealth showed that [DeJesus] evaded an arrest on at least one occasion . . . mak[ing] clear that [he] knew of his fugitive status and intended to evade police custody, which in turn suggested his consciousness of guilt").

Applying the foregoing authority to the facts before us, there exists no question in my mind that the Commonwealth failed to satisfy its evidentiary burden. This record contains no evidence that Smith knew of the existence of the bench warrant at the time of his April 2014 arrest, or that he had received notice that one would be issued for his failure to appear for any particular proceeding (or for any other reason). The record is equally silent as to why the warrant was issued in the first place, beyond two fleeting references to a "probation violation" made by the Commonwealth after the close of evidence. *See* N.T., 10/14/2016, at 22-23. Although the Commonwealth marked the warrant as Exhibit C-3 at the close of Smith's preliminary hearing, N.T., 6/12/2014, at 25, it does not appear that the exhibit was moved into evidence during those proceedings or

subsequently at Smith's bench trial. *See Commonwealth v. Williams*, 715 A.2d 1101, 1103 (Pa. 1998) ("Appellate courts are limited to considering only those facts that have been duly certified in the record on appeal.") (cleaned up). Of course, if Smith had received notice of a court date in connection with a probation violation—whether technical or direct—and then deliberately failed to appear, that would be probative of his intent to abscond from justice. If he had received notice of the bench warrant itself, the presumption would be even stronger. But the Commonwealth abdicated its duty by presenting nothing of the kind.

For these reasons, I am skeptical that the Commonwealth's bare stipulation would have sufficed to make out even a *prima facie* case that Smith was a fugitive, let alone prove his status beyond a reasonable doubt. The only relevant entry on the docket proffered by the Commonwealth in the parties' stipulation shows that a bench warrant had been issued on April 3, 2014, for a "probation violation." *See* Docket No. CP-51-CR-0003923-2011, at 7.[12] There is no testimony indicating that Philadelphia County deputy sheriffs had attempted to serve the warrant at Smith's "usual place of residence within" the city before his coincidental capture therein on April 21 of that year. *See Blackman*, 17 A. at 195. Nor does the record suggest that Smith was hiding or in active flight during those eighteen days. Instead, he was found relaxing in broad daylight, his legs dangling out of the open side door of a green 1998 Ford Windstar minivan on a public street in

---

[12] From that docket and the sentencing hearing transcript in this case we can deduce that Smith had been found with contraband while serving a prison sentence for an unrelated matter in 2010. N.T., 2/2/2017, at 29. He entered a negotiated guilty plea to a single count of possession of a controlled substance by an inmate, 18 Pa.C.S. § 5123(a.2), a second-degree felony, and was sentenced to six to twenty-three months' imprisonment followed by three years' probation. Docket No. CP-51-CR-0003923-2011, at 4. Prior to his April 2014 arrest, Smith apparently had violated his probation (how, exactly, remains unclear), prompting the court to issue a bench warrant. Immediately following sentencing in this case, Smith was sentenced to a term of four years' probation, to run concurrently with his sentence in the instant case. *Id.*

Philadelphia. *See* N.T., 10/12/2016, at 46-47. That degree of conspicuousness might seem counterintuitive if one's goal is to keep a low profile, as a fugitive might be wont to do. Furthermore, the registered owner of the van—a female acquaintance of Smith's who lived in the house in front of which the van innocuously was parked—was a person known to the Commonwealth at the time of Smith's 2016 trial. But she was not called to testify. Perhaps she could have shed some light on whether Smith had willfully absconded "for the manifest purpose of avoiding arrest." *Blackman*, 17 A. at 195. We may never know.

In sum, the absence of evidence demonstrating Smith's awareness of the criminal proceedings against him, and his concomitant intent to abscond from those proceedings, should be dispositive of the sufficiency question here. But the Majority's sweeping holding is far more problematic than the erroneous resolution of the instant appeal. The mere existence of a bench warrant, without more, cannot suffice to prove that a person is a "fugitive from justice," and thus categorically prohibited from possessing a firearm. *See id.* The Majority's contrary holding casts a net of disturbing breadth, threatening to classify thousands of Pennsylvanians as fugitives *per se*—summarily stripped of their constitutional rights and subject to criminal prosecution—regardless of whether their conduct is consistent with that of a "fugitive" by any cognizable definition.

Further, the Majority's analysis essentially eliminates an important *scienter* consideration from the Uniform Firearms Act. Absent the requisite proof that a defendant knew of his prohibited status at the time he possessed a firearm, *see generally Rehaif*, 139 S.Ct. 2191, Section 6105 presents a threat of criminal prosecution for conduct that an individual has no reason to believe is illegal. Although this Court has not yet adopted an interpretation of Section 6105 along the lines of *Rehaif*, that approach is compelling. Yet the Majority moves in precisely the opposite direction. Rather than requiring that a person have knowledge of his prohibited status, the Majority would simply deem an

individual to be a "fugitive from justice" immediately upon the issuance of a bench warrant. The Majority's bright line test seemingly would apply irrespective of the individual's intent and without regard for whether he knew that such a warrant automatically rendered his possession of a firearm unlawful. This effectively transforms subsection 6105(c)(1) and other offenses based upon one's prohibited status into strict liability crimes, which are "disfavored and of questionable validity." *See Commonwealth v. Samuels*, 778 A.2d 638, 641-44 (Pa. 2001) (Saylor, J., concurring).

Because the Majority's overbroad and shortsighted holding risks criminalizing the conduct of countless individuals without their knowledge, while they engage in what they believe to be the lawful exercise of the right to keep and bear arms—a right protected by the Second Amendment to the United States Constitution and Article I, Section 21 of the Pennsylvania Constitution—I respectfully dissent.